# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERND DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **LARRY D. MOSLEY,** | ) | |
| **Petitioner,** | ) | **Civil Action No. 7:21cv00435** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **PHILLIP A. WHITE, Warden,** | ) | **By:  Michael F. Urbanski** |
| **Respondent.** | ) | **Chief United States District Judge** |

Larry D. Mosley, a Virginia inmate proceeding <u>pro se</u>, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2015 convictions in Lynchburg Circuit Court.  The respondent has filed a motion to dismiss, to which Mosley has responded.  Mosley has also filed a motion for summary judgment.  The court has received and reviewed the complete record from the state courts, and the matter is now ripe for decision.  For the reasons stated below, the respondent's motion to dismiss will be granted, and Mosley's motion for summary judgment will be denied.

## I.

On December 2, 2014, Mosley's third cousin, Keith Payne, stopped by  Mosley's home for a visit before 10:00 p.m.  While at Mosley's home, Payne consumed cocaine and marijuana.  Around 10:00, Payne called his girlfriend, Tiffany Reed, and said he was on his way home from Mosley's and would be there in about 15 minutes.  While on the phone with Reed, Payne told Mosley to calm down, but Payne did not seem angry or upset.  Trial R. at 897–902. [1]  At 10:07 p.m., Lynchburg 911 dispatcher, Zachary Perkins, received a 911 call from Payne, stating that

---

[1] Citations to Trial R. reference the Lynchburg Circuit Court record in <u>Commonwealth v. Mosley</u>, No. CR15-201, using the page numbers typed in the lower right corner of each page.  Citations to the habeas record in <u>Mosley v. White</u>, No. CL20-507 (Lynchburg Circuit Court), will refer to Habeas R.

he had just been shot in the chest and abdomen and needed help.  Perkins asked if he knew who shot him, and Payne responded that he was standing over him right now.  Id. at 903–908.

Officers arriving on scene had been advised that the shooter was still in the apartment, so they yelled for anyone inside to come out with hands up.  No one came out, and they cautiously opened the door, which was unlocked, and went inside, continuing to call for anyone inside to come out.  After approximately two minutes, Mosley came from the back room, and he was arrested and placed in the police car immediately.  After conducting a protective sweep of the apartment, Officer Pavia asked Payne who shot him, and he said it was a family member.  The officer then asked if it was the person they had just arrested after he came from the back room, and Payne said yes.  R. at 818–833.

Officer Gardner transported Mosley to the police station.  On arrival, Mosley needed to use the restroom.  Gardner testified that Mosley washed his hands after using the restroom, and then Gardner placed Mosley in an interview room.  Id. at 972–974.

Payne was transported to the emergency room at Lynchburg General Hospital, and as he was prepped for emergency surgery, Jenny Reynolds, a forensic nurse examiner, came into the cubicle where doctors and other nurses were working on Payne.  She saw that he had an oxygen mask on his face.  When she asked him who shot him, he just moaned.  She then asked if he did not know who shot him or if he just did not want to tell her.  He said the name Larry Mosley.  Reynolds lifted the oxygen mask to hear him more clearly and asked if he had said Larry Mosley, to which he responded affirmatively.  Reynolds returned to speak with him five days later and asked him who shot him.  Payne shrugged his shoulders.  When she asked what happened, he said he did not remember.  Id. at 909–921.

2

Payne died from his injuries on December 8, 2014, and a new arrest warrant was secured charging Mosley with second-degree murder, rather than malicious wounding. The grand jury later indicted Mosley on April 6, 2015, for murder in violation of Virginia Code § 18.2-32, possession of a firearm by a convicted felon in violation of Virginia Code § 18.2-308.2, and use of a firearm in the commission of murder in violation of Virginia Code § 18.2-53.1. R. at 45.

Dr. Jennifer Bowers, Assistant Chief Medical Examiner, conducted Payne's autopsy in Roanoke. Both bullets remained in Payne's body, embedded in the muscles of his back, and she removed them. She traced the path of both bullets. One entered through the left side of the diaphragm on the front of Payne's body, traveling to the back at a leftward angle, and went through a rib and his spleen before coming to rest. The other bullet entered Payne's front right abdomen, also traveling at a left and back angle, through the right side of the diaphragm, the omentum, right lobe of the liver, right kidney, and twelfth rib. Dr. Bowers opined that either bullet could have been fatal by itself. She also opined that Payne was in motion when the shots hit him, because of the bullet trajectories. Finally, she indicated that his urine was positive for cocaine and marijuana. Id. at 834–857.

Detective Kittrell obtained warrants for a GSR kit on Mosley and for searching Mosley's apartment. Even though Mosley had washed his hands, Kittrell thought that taking the samples from Mosley's hands might be beneficial, so he performed the test, sealed the package, and sent it to the lab. R. at 975–979.

Officer Doss executed the search warrant at Mosley's apartment and took pictures of the scene. Items recovered included a .38 caliber revolver on a shelf in the bedroom along

with mail addressed to Mosley and the identification of Mosley and Payne, some rifle ammunition in the living room floor, a baggie of miscellaneous ammunition on top of a pile in the closet, half a blue pill and white powder in the living room floor near an overturned coffee table, a baggie of white powder on the sofa, and a brown blanket with holes, one of which looked burned.  Inside the revolver, Officer Doss found three empty casings and one unspent cartridge.  Other than inside the gun, none of the ammunition in the apartment was for use with a .38 caliber weapon.  Officer Doss acknowledged that the blue pill and white powder were never sent to the state lab for analysis.  Id. at 988–1099.

Douglas DeGaetano, a trace evidence examiner from the Virginia Division of Forensic Science testified that the GSR sample taken from Mosley indicated one particle characteristic of primer residue on his left hand and several particles consistent with primer on both the left and right hands.  He clarified that a characteristic particle contains barium, antimony, and lead, the three components of primer, while a consistent particle contains two out of the three elements.  He acknowledged that no GSR kit was submitted to him to evaluate the presence of residue on Payne.  Id. at 1045–1058.

Wendy Gibson, firearm and tool mark examiner for the Division of Forensic Science, examined the revolver recovered from Mosley's apartment.  She described it as a Smith and Wesson .38 caliber revolver, in good working order, with two internal safety features:  First, a hammer block prevents the gun from firing unless the trigger is pulled all the way back; second, a rebound feature re-sets the hammer after a shot is fired, so that the trigger must be pulled again before another shot can be fired.  By comparing the marks on a test-fired bullet with the bullets retrieved from Payne's body and the empty cartridge casings in the gun, she determined

that the bullets which killed Payne had been fired from the revolver.  Gibson also examined the blanket, finding one hole with lead on the perimeter on both sides and some soot on the nearby blanket.  The other hole appeared to be an ordinary tear.  Id. at 1059–1081.

Beyond the testimony above, two different versions of the shooting were given to the jury.  First, Roy Davis testified for the Commonwealth.  Davis was in jail awaiting trial on charges when Mosley was placed in the same cell-block.  Davis testified that Mosley was his uncle, specifically, his father's brother.  While they were housed together, they talked about their respective cases.  According to Davis, Mosley said that he owed $50 to Payne and could not pay the debt that night, which is when the argument started.  When things got out of hand, Mosley pulled a gun.  Payne kept telling him to calm down and was backing away from Mosley when Mosley shot him twice.  Mosley said he ran into the next room and hid the gun in a cubby hole.  When he came back, Payne was on the phone with 911.  Mosley stood over Payne and heard him tell the 911 operator that a relative had shot him.  Mosley did not provide any assistance to Payne.  Davis said that Mosley said everyone thought it was over a girl, but that it was over money.  Then, according to Davis, Mosley said he needed to save himself, because there was nothing he could do for Payne.  Mosley asked Davis if he thought self defense would fly if he testified that the gun was beside Payne, and when things got ugly, he rushed to get the gun away from Payne.  After he got the gun, Payne backed him into a corner, so he fired the gun.  Davis then reached out to the Commonwealth's Attorney to tell him what Mosley said because "it's the right thing to do."  Id. at 932.  Davis denied the existence of any deal with the Commonwealth Attorney for his testimony, but he hoped he would get some credit if he was convicted in his case.

5

On cross examination, Davis acknowledged that his trial had been postponed a few times and was currently scheduled in February 2016. He again denied any deal with the Commonwealth. Davis admitted he was facing charges for possession of a firearm by a felon and shooting from a motor vehicle, for which he faced a possible sentence of 15 years. He had six prior felony convictions. When confronted about letters he had written to the Commonwealth's Attorney, Davis was forced to admit that he had asked for his charges to be dropped in exchange for his testimony against Mosley. He would not go so far as admitting that he hoped or expected the charges to be dropped, though. He insisted that he was an honest person, and the only reason he was testifying against Mosley was because Mosley had killed a family member. Defense counsel asked Davis several times if he considered himself an honest man, if he was telling the truth, if the jury could believe him because he was an honest man. He then asked Davis if an honest man would steal and confronted him for a conviction of stealing jewelry; Davis admitted pleading guilty and going to prison for that but said he had not really done it. He asked Davis if an honest man sells drugs. Davis said he had done that in the 1980s and 1990s, so the answer would have to be yes and no. Davis finally admitted that he had not always been an honest person, but he claimed he was honest now. During cross-examination, Davis kept trying to answer a different question from the one asked, so counsel repeated questions several times, drawing several objections from the Commonwealth for "asked and answered," which the court sustained. Id. at 926–967. The trial court also objected sua sponte to some of the defense questions. Three brief witnesses after Davis, defense counsel moved for a mistrial based on the influence of the judge's rulings on the jury's perception of counsel. The court denied the motion. Id. at 980–987.

The other version of events was Mosley's testimony.  He testified that Payne was a third cousin, and the two got along fine, never had any problems.  Mosley did yardwork for Payne and Tiffany during the summer.  Payne called Mosley "Unc," short for uncle, as a joke, because of the difference in their ages.  Mosley was 63, and Payne was 32.  During the fall of 2014, Payne had asked Mosley to help him move some things out of Tiffany's house because they had had some disagreement.  Mosley kept Payne's belongings at his house, and Payne often came by to shower and change clothes.  Id. at 1092–1097

On December 2, 2014, Mosley had been to physical therapy for his shoulder during the afternoon.  He came home, ate dinner, and around 9:00 lay down on the sofa to watch television.  Shortly before 10:00, someone knocked at the door, and it was Payne.  He invited him inside and they both sat on the couch and talked awhile.   Payne had a new phone he was excited about and spent most of his time playing with the new phone.  Mosley got up to do some things he needed to do while Payne played with the phone.  Mosley then got a call from a friend who asked him if he would go pick up her mother on Clay Street, and he said he would.  The friend was to call him back with the exact address.  He began getting dressed to go out, and while he was dressing, he kept hearing Payne snorting cocaine.  He was concerned that Payne might be doing a little too much, because Payne already had a breathing problem, and he sounded terrible while snorting.  Mosley told Payne to lighten up on the coke.  Payne just looked at him, and Mosley went back to getting dressed in his bedroom, but he could still hear Payne continuing to snort cocaine, so came out again and said to lighten up on the coke.  Payne told him to calm down.  Mosley came further into the room, and Payne told him to

7

calm down again.  Mosley then realized that Payne was on the phone with somebody.  Id. at 1097–1101.

When Payne got off the phone, he was very angry and asked Mosley why he kept coming in saying something about coke while he was on the phone, didn't he know that other people could hear him.  Mosley said that's reasonable, but Payne was very agitated, glaring at Mosley and reaching for something on the sofa without looking away from Mosley.  Mosley was not sure what he was looking for and then realized Payne had a gun beside him on the sofa.  As Payne was reaching for the gun, Mosley grabbed it and backed away towards the door.  Payne knocked over the coffee table into the middle of the living room and got up, walking towards Mosley, saying give me the gun.  Mosley asked him why he had a gun with him, but Payne just said, "give me the f***ing gun." Id. at 1104.  Mosley was trying to get out the front door by then, but the safety lock was on the door.  He could not raise his bad arm up to unlock the top lock.  Payne kept advancing towards him, and Mosley fired.  Payne did not act like he had been shot and kept coming towards him, so Mosley fired again.  Payne stopped, stepped back three steps, went down on his knees, and leaned over the sofa, getting his torso onto the sofa.  Then Payne called 911.  Id. at 1101–1107.

Mosley testified that he stood there in shock, not sure what was happening.  His ears were ringing from the gunshots.  He realized that Payne was on the phone with 911 asking for help and telling them to hurry.  He put the gun on his bed at first but thought that was not a safe place to put it, so he moved it to the top shelf of his shelving cubby.  He went back in the living room and stood by Payne while he talked to the 911 operator.  The operator was trying to keep Payne talking so he would not lose consciousness.  Mosley went over and unlocked

all locks on the front door, so that the paramedics could come in when they arrived.  He opened the blinds so they could see when someone was coming. Mosley started looking for his phone at that point, so he could call someone to let them know what had happened, but he couldn't find his phone.  He saw the first responders run past the apartment and told Payne that they had just passed by the apartment.  Payne relayed the information to the 911 operator.  Mosley went back to the bedroom to look for his phone.  He did not hear the officers until they came into the apartment, because the television was on.  As soon as he knew they were there, he came out.  Id. at 1107–1114, 1122–1125.

On cross examination, Mosley admitted again that he shot Payne.  He denied intending to kill him, saying only he was trying to get him to stop approaching him.  He admitted he never called 911, because he could not find his phone and because Payne had already called. He did not take the phone from Payne to talk to the 911 operator, because he did not think that would be appropriate.  Finally, he acknowledged 23 prior felony convictions.  Id. at 1115– 1122.  The Commonwealth Attorney had already introduced a certified copy of Mosley's 1989 conviction for malicious wounding.  Id. at 817.

The trial court denied counsel's motion to strike the evidence of first-degree murder, finding premeditation to be a question for the jury.  The jury was instructed on the elements of first-degree murder, second-degree murder, and voluntary manslaughter, as well as the law of self-defense.  The jury was further instructed on the elements of the other charges.  Id. at 409–467.  After deliberations, the jury returned a verdict of guilty for second-degree murder, use of a firearm in commission of murder, and possession of a firearm by a convicted felon. During the sentencing phase of the jury trial, the Commonwealth introduced 26 exhibits,

certified copies of each criminal conviction Mosley had, felony and misdemeanor alike, since 1971. The court instructed the jury on the appropriate sentencing ranges, and the jury recommended a sentence of 30 years for murder, 5 years for use of a firearm in commission of murder, and 3 years for possession of a firearm by a felon. Id. at 1210–1226.

The trial court ordered a presentence report and set the matter for a later hearing. In the meantime, Mosley filed a pro se motion to set aside the verdict and grant a new trial. Mosley also retained new counsel, who also filed motions to set aside the verdict and grant a new trial or alternatively, to set aside and dismiss the murder for conviction as unsupported by the evidence. Counsel argued the motions on September 7, 2016, and the trial court denied the motions. The court then imposed the sentence recommended by the jury, noting that the jury's recommendation fell within the sentencing guidelines range. Id. at 1356–1400.

Mosley appealed the convictions and sentenced to the Court of Appeals of Virginia, raising four issues: (1) The trial court erred in admitting hearsay statements of Payne to the 911 operator, to Officer Pavia, and to Nurse Reynolds. (2) The trial court erred in denying the defense motion for mistrial. (3) The trial court erred in refusing defendant's heat of passion jury instruction. (4) The evidence was insufficient to support the conviction. The Court of Appeals denied the appeal on May 12, 2017, and Mosley's request for reconsideration by a three-judge panel was denied on September 20, 2017. Appellate counsel failed to appeal to the Supreme Court of Virginia, and Mosley was granted a delayed appeal. The high court refused his petition for appeal on July 16, 2019. Mosley v. Commonwealth, No. 181646 (Va. July 16, 2019).

Mosley filed a state habeas petition on May 8, 2020, raising 15 allegations of ineffective assistance of trial counsel, 2 claims of ineffective assistance of appellate counsel, 13 claims of prosecutorial misconduct, 3 claims of police misconduct, and 3 claims of trial court abuse of discretion violating his rights.  The respondent moved to dismiss the petition, attaching an affidavit from trial counsel to the motion.  The habeas trial court granted the motion to dismiss and dismissed the habeas petition in an opinion entered July 20, 2020.  The Supreme Court of Virginia denied Mosley's appeal on July 14, 2021.

## II.

Mosley timely filed his § 2254 petition in this court, raising the following claims:

A.  Claims Alleging Ineffective Assistance of Trial Counsel:

1. Failing to object to arguments, instructions, and other incidents of trial referring to first-degree murder when the indictment alleged second-degree murder;

2. Failing to call witnesses to testify for the defense that Mosley had asked counsel to call, namely Mutts, Linwood Turner, Patricia Franklin, Mosley's physical therapist, and three of the medical first responders;

3. Failing to hire an investigator to retrieve evidence from the crime scene, a bullet in the wall;

4. Failure to request an SDT for telephone records of the victim and of Mosley;

5. Failure to obtain the victim's criminal record and use it at trial;

6. Failing to introduce evidence to contradict the police summary report, including by introducing evidence that the victim was in motion, not lying on the couch, when he was shot;

7. Failing to introduce letters written by Davis, which showed his motivation for testifying, and failing to adequately cross-examine Davis;

8. Failing to make the jury aware of the improper manner in which evidence was deliberately withheld from trial, such as when the police did not send the blue pill, marijuana, and white powder to the lab for testing, and otherwise failing to subject the state's case to meaningful adversarial testing.

B. Claims Alleging Ineffective Assistance of Appellate Counsel:

1. Not allowing Mosley to argue his own pro se motion to set aside verdict and grant a new trial;

2. Not raising arguments that Mosley asked him to make, including ineffective assistance of trial counsel.

C. Alleged Prosecutorial Misconduct Claims:

1. Violation of Brady[2] obligations by failing to provide the victim's criminal record;

2. Constructively amending the murder charge to first-degree murder, instead of second-degree murder as alleged in the indictment;

3. Misstating Mosley's statements in a recorded phone call from the jail;

4. Withholding the drugs found at the scene from the lab and failing to inform the jury about Payne's prior convictions;

5. Knowingly offering perjured testimony from Davis;

---

[2] Brady obligations are named after the case Brady v. Maryland, 373 U.S. 83 (1963) (recognizing a prosecutor's due process duty to disclose material, potentially favorable evidence in its possession to the defendant before trial).

6.   Mischaracterizing Mosley's self-defense testimony during closing argument.

D.  Claims Alleging Police Misconduct:

    1.  Detective Kittrell failed to submit crime scene evidence (the drugs) to the lab for testing;

    2.  Detective Kittrell lied in his police report and at trial to try to make it look like the blanket proved that Payne was lying down when he was shot;

    3.  Detective Kittrell failed to interview the victim, even though Payne was awake and alert several days after the shooting.

E.  Claims of Abuse of Discretion by the Trial Court:

    1.  Denied Mosley's due process rights by dismissing the pro se motion to set aside verdict and grant new trial without allowing Mosley to argue the motion himself;

    2.  Allowing references to first-degree murder, and instructing the jury on first-degree murder, when the indictment charged only second-degree murder.

## III.

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).  A decision is contrary to federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the

opposite result on facts that are materially indistinguishable from the Supreme Court case's facts. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state's application of law or determination of facts is unreasonable only if there is no possibility of fairminded disagreement. Harrington v. Richter, 562 U.S. 86, 103 (2011). The question is not whether a federal court believes the state court's decision is incorrect, but whether the decision was unreasonable, which is a "substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). Further, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A federal district court reviewing a § 2254 petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds. The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights. Coleman v. Thompson, 501 U.S. 722, 730–31 (1991).

A habeas petitioner is required to exhaust his claims in state court before his claims can be considered in federal court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court, on the merits, before he is entitled to seek federal habeas relief. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. Duncan v. Henry, 513

U.S. 364, 365–66 (1995); Kasi v. Angelone, 300 F.3d 487, 501–02 (4th Cir. 2002). Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732.

A separate but closely related issue is the doctrine of procedural default. If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state's court's decision, that claim is also procedurally defaulted for purposes of federal habeas review. Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. Yeatts v. Angelone, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest state court and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now is considered simultaneously exhausted and defaulted. Bassette v. Thompson, 915 F.2d 932, 936–37 (4th Cir. 1990).

Before a federal habeas court will consider a procedurally defaulted claim (or an unexhausted claim that has become exhausted and defaulted), the prisoner must show both cause for the default and actual prejudice from the claimed federal law violation. Coleman, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor, external to the defense and not attributable to the prisoner. Id. at 756–57. To show prejudice to overcome procedural default, a petitioner must show that the claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).

16

## IV.

The court will apply the standards above to the twenty-one claims raised in Mosley's petition. Because of the factual and/or legal overlap between several claims, the issues will not necessarily be addressed in the order in which they were raised, to reduce repetition.

### A. **Procedurally Defaulted Claims**

The state habeas opinion found that each of Mosley's prosecutorial misconduct claims, police misconduct claims, and claimed trial court errors was procedurally defaulted because Mosley did not raise the issues on <u>direct appeal</u> of his conviction. Gov. Ex. C at 6–7, ECF No. 13-3.[3]  As noted previously, if a claim has been defaulted in state court under an independent and adequate state procedural rule, then the claim is also defaulted for purposes of federal habeas review. <u>Breard</u>, 134 F.3d at 619. Virginia courts have long held that a writ of habeas corpus may not be used as a substitute for properly raising issues on direct appeal. <u>Slayton v. Parrigan</u>, 215 Va. 27, 29, 205 S.E.2d 680, 682 (1974). The Fourth Circuit Court of Appeals has repeatedly held that the rule of <u>Slayton v. Parrigan</u> is an adequate and independent state ground for its decision.  <u>Mu'Min v. Pruett</u>, 125 F.3d 192, 196 (4th Cir. 1997). The only issue that Mosley presented to the Supreme Court of Virginia on his direct appeal was the admission of Payne's statements to the 911 operator, to Officer Pavia, and to Nurse Reynolds. Therefore, the state habeas court reasonably found that Mosley did not raise his issues of prosecutorial misconduct, police misconduct, and trial court error on direct appeal and had procedurally defaulted them. Further, that Mosley raised these issues in his state habeas case

---

[3] The Lynchburg Circuit Court's habeas opinion is the last reasoned opinion from the state court. The Supreme Court of Virginia denied the appeal in a summary order; accordingly, this court looks through to the last reasoned opinion to determine if the decision was based on a reasonable determination of the facts and a reasonable application of federal law. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

and in his state habeas appeal does not change the fact that they were already defaulted under state law.

Claims C(1) – C(6), D(1) – D(3), and E(1) – E(2) in the current petition were trial errors that must be objected to at trial and on direct appeal in Virginia. None of them were raised at trial or on direct appeal, and they are considered procedurally defaulted under the independent and adequate state law ground stated in <u>Slayton</u>, 215 Va. at 29; 205 S.E.2d at 682. Even though Mosley raised most of those issues in his state habeas petition (except for E(2), which was not raised even in his circuit court habeas petition, making that issue simultaneously defaulted and exhausted) and in his habeas appeal to the Supreme Court of Virginia, that did not change the status of these issues. Because they were procedurally defaulted under state law, they are also defaulted for purposes of federal habeas. <u>Breard</u>, 134 F.3d at 619.

To prevail on any of these state-defaulted claims in federal habeas, Mosley must show cause for default and actual prejudice from the default. <u>Coleman</u>, 501 U.S. at 750. As indicated, cause for default requires the existence of some objective factor, external to the defense and not attributable to the prisoner. <u>Id.</u> at 756–57. Trial counsel's failure to raise the issue is not cause. Mosley has offered no explanation for failure to raise these issues sooner, other than that his attorney did not raise them. For that reason alone, he is not entitled to federal habeas relief on any of the grounds listed in subsections C, D, and E of Section II above. However, for the reasons stated below, he has not shown any prejudice from defaulting these issues, either.

### 1.  Failure to Provide Victim's Criminal Record

In his federal petition, Mosley contends that the prosecutor violated <u>Brady</u> by failing to provide the victim's criminal record to the defense.  Although Mosley raised this issue in post-trial motions before the trial court, he did not keep the issue alive on his direct appeal, thereby defaulting it.  He cannot show prejudice from this default because the trial court held, based on representations of the Commonwealth's Attorney, that the victim's criminal history was placed in the file one week before defense counsel viewed the file, pursuant to the Commonwealth's open-file policy.  Trial R. at 1377.  Having made the file material available to counsel for review, the prosecutor did not commit a <u>Brady</u> violation.  Absent a violation, there can be no finding of prejudice.

### 2.  Constructively Amending the Charges to First-Degree Murder

The first count of the indictment against Mosley reads as follows:

### 1.  Murder (VCC Code: MUR-0925-F2)

> On or about Tuesday, December 2, 2014, unlawfully and feloniously did kill and murder with malice aforethought Haywood Keith Payne Jr., in violation of § 18.2-32 of the Code of Virginia (1950) as amended.

Trial R. at 45.

At common law, murder was defined as the unlawful "killing of a human being with malice aforethought."  Murder, <u>Black's Law Dictionary</u> (11th ed. 2019).  There were no degrees of murder.  Virginia, by statute, adopted a statutory scheme in which some murders were considered more culpable than others, for purposes of punishment.  By doing so, the Virginia legislature did not intend to change or divide the common-law crime of murder into two separate offenses.  <u>Wicks v. Commonwealth</u>, 2 Va. Cas. 387, 391 (1824).  An indictment for

murder, as defined by common law—an unlawful killing, with malice aforethought—charges murder in the first degree.  <u>Davis v. People</u>, 151 U.S. 262, 269–70 (1894).

As noted by the Court of Appeals of Virginia, the Virginia Code specifically authorizes a short-form indictment for murder (Va. Code § 19.2-221), and  Rule 3A:6(a) of the Rules of the Supreme Court of Virginia also requires an indictment to cite the statute under which a person is being charged; together, these provisions suggest that incorporation by reference of the statute cited in the indictment provides adequate notice of the charges against the accused.  <u>Walshaw v. Commonwealth</u>, 44 Va. App. 103, 109–10, 603 S.E. 2d 633, 636 (2004).

Mosley correctly asserts that the Due Process Clause and the Sixth Amendment require that an accused be informed of the specific charge against him.  While acknowledging that one way to provide notice is to list all the elements of the offense in the charging document, the Fourth Circuit Court of Appeals noted that this is not the only way to provide constitutionally sufficient notice.  <u>Hartman v. Lee</u>, 283 F.3d 190, 196 (4th Cir. 2002).  More importantly, for purposes of the present claim, the court emphasized that first-degree and second-degree murder are not two separate crimes, but different levels of the same crime, classified based on level of atrocity.  <u>Id.</u> at 196 (citing <u>Davis</u>, 151 U.S. at 266).

Mosley's indictment complies with Virginia Code § 19.2-221.  The indictment also includes Code § 18.2-32, which, at the time of Mosley's indictment, stated that:

> Murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate object sexual penetration, robbery, burglary or abduction, except as provided in § 18.2-31, is <u>murder of the first degree</u>, punishable as a class 2 felony.

20

Id. (1998 until June 30, 2021) (emphasis added).  The statute then goes on to note that all murder except capital and first-degree murder would be second-degree murder, punishable from five to forty years in prison.  Finally, the indictment referenced VCC Code: MUR-0925-F2, which is the VCC Code for first-degree murder.  See Va. Crime Codes, www.vcsc.virginia.gov/codes_qbe.html.

Because Mosley's indictment was an indictment for first-degree murder, the prosecution did not constructively amend the charge, nor were his arguments to the jury improper.  Because the prosecutor did not constructively amend the charge, Mosley has not been prejudiced by failing to preserve this issue in his direct appeal.  Further, the jury convicted Mosley of second-degree murder, not first-degree murder, negating any harm from the higher charge.

### 3.  Misstating Mosley's Statements in a Recorded Phone Call from the Jail

Mosley has not identified what statements of the prosecutor mischaracterized Mosley's statements during a recorded phone call from the jail, and after reviewing transcripts, the court has not found any that obviously misstated Mosley's words or inferences that could be drawn from them.  The recording of one phone call from Mosley was played for the jury.  Trial R. at 1036. A CD containing the recording of that call (and of one other call) was introduced into evidence.  The jury had the opportunity to hear what Mosley said and determine for themselves how much weight to give those statements.  The jurors were also instructed that "what the attorneys say . . . is not evidence in the case."  Id. at 770.  Jurors are presumed to follow the instructions of the court.  United States v. Benson, 957 F.3d 218, 235–36 (4th Cir. 2020);

United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994). Mosley has failed to show any prejudice from this defaulted claim.

### 4. **"Withholding" Drugs from the Lab**

Detective Kittrell testified that he had consulted with the Commonwealth Attorney's Office regarding what items to submit to the lab for testing. Trial R. at 1040. Among the items not sent to the lab were the baggie of white powder, the half blue pill, and the folded $10 bill next to the white powder. Mosley alleges that the Commonwealth deprived him of the best evidence to prove that Payne had been using cocaine by not having the evidence tested. Even had Mosley timely raised this issue, it has no merit. First, the prosecutor has no duty to create exculpatory evidence, only to disclose the evidence that already exists, which he did. The medical examiner testified that Payne had cocaine and marijuana in his system, so the lab analysis would have been cumulative at best. Officer Doss also testified that she photographed the items at the scene because she believed them to be illegal substances. Finally, Detective Kittrell was discussing evidence to be used in a homicide case, not a drug prosecution. There is no misconduct in determining that the chemical makeup of the probable drugs at the scene were not relevant to the investigation of the shooting. One can assume that similar reasoning was used when the rifle ammunition was not sent to the lab for analysis, since the bullets that killed Payne were .38 caliber. Because the issue has no merit, there is no prejudice to Mosley.

### 5. **Knowingly Offering Perjured Testimony from Davis**

Mosley contends that Davis perjured himself to get a better deal from the state on his own charges. His attorney implied the same at trial. Right now, the parties do not know

22

whether the jury believed Davis' testimony or whether they were persuaded of Mosley's guilt by other evidence in the case.  However, existence of a motive to lie coupled with a prisoner's assertion that a witness lied does not prove perjury.  Nor does it prove that the prosecutor knew that the testimony was false.  Based on the other evidence in the case, the prosecutor had every reason to believe that Davis was telling the truth.  Nothing Mosley has said constitutes proof to the contrary.  Without objective proof of falsity and objective proof of the prosecutor's actual knowledge, the claim has no merit, and Mosley has not been prejudiced.

### 6. <u>Mischaracterizing Mosley's Self-Defense Testimony</u>

Mosley alleges that the prosecutor misrepresented his self-defense testimony during closing arguments.  A review of the transcript does not support the argument.  Trial R. at 1286–1291.  The prosecutor never quotes Mosley at all, though he does point out that Mosley admitted shooting the gun.  In arguing the Commonwealth's position that the evidence did not support self-defense, the prosecutor pulled pieces from several different sources:  Davis' testimony about what Mosley said to him, inferences that he drew from the hole in the blanket with soot around the edge, the number of bullets fired, etc.  That is what lawyers do when they make a closing argument; they pull points that support their position and tie them together.  There is nothing improper about that.  Even though Mosley's argument is that Davis lied to get a better deal in his own case and that the hole in the blanket was not related to the shooting, the prosecutor is not limited to arguing the defendant's perception of the facts.  He is entitled to argue all reasonable inferences from the evidence.  Prosecutors (and all attorneys) enjoy considerable latitude in presenting arguments to a jury.  <u>Bates v. Lee</u>, 308 F.3d 411, 422 (4th Cir. 2002).  The adversary system allows a prosecutor to prosecute vigorously and to strike

hard blows, but not foul ones.  Berger v. United States, 295 U.S. 78, 88 (1935).  Because the prosecutor's argument was not improper, Mosley cannot show prejudice from this defaulted claim.

### 7.  Detective Kittrell's Failure to Send Drugs to the Lab

Mosley alleges that Kittrell's failure to send the blue pill and the white powder to the lab for analysis constitutes police misconduct.  Because Kittrell, along with the prosecutor, determined that the chemical composition of the drugs was not relevant to their investigation of the shooting, there was nothing improper about the police officer's decision, for the reasons explained previously in subsection A(2) above regarding the prosecutor.  This claim is without merit and Mosley cannot demonstrate prejudice from defaulting this claim.

### 8.  Kittrell Falsified the Police Report

Mosley alleges that Kittrell lied in his police report about the blanket to create the impression that Payne was lying down when Mosley shot him and that Kittrell placed the irrelevant blanket into evidence for no reason, other than to support his statements in the report.  The Commonwealth's Attorney then relied on that as the basis for his arguments.

Mosley accurately describes photographs and testimony from other witnesses to argue that the blanket was not on Payne when he was shot.  Although this other evidence could support a finding that the blanket was not on top of Payne when he was shot, the jury as factfinder is the sole determiner of which facts and conclusions to accept.  At most, Kittrell's conclusion was inaccurate.  Inaccuracy, however, is not the same as lying.  A lie is a "false statement made with deliberate intent to deceive, an intentional untruth."  Dictionary.com. The evidence falls far short of proving intentional fabrication of facts.

To start with, police photograph and collect all items of evidence at a crime scene. Not all such items will later be considered relevant, but removable items surrounding a crime are generally photographed and recovered. The blue pill and white powder were recovered. Bullets for use in different types of weapons were recovered. Clothing was recovered. The blanket was recovered. Recovery of the blanket from the sofa where Payne was lying when first responders arrived was reasonable and part of the officer's job.

Kittrell sent the blanket to the lab for analysis because he noticed the holes and black soot on the blanket. Forensic scientist Wendy Gibson testified that one of the holes had lead particles around it and was consistent with being penetrated by a projectile. The black soot was consistent with material that might rub off a gun after it was fired. She did not check for the presence of primer residue, however. Based on this information, one cannot say that Kittrell's theory of the case, adopted by the Commonwealth Attorney, was deliberately false. The Commonwealth had its theory of the case, and Mosley had his version of events.

Notably, the jury did not convict Mosley of first-degree murder. Likely, if the jury believed that Mosley shot Payne while he was lying down under a blanket, the jury likely would have convicted him of first-degree murder. Because there is no evidence of intentional falsehood in the police report, no improper argument based on the evidence, and no conviction for willful, deliberate, and premeditated murder, Mosley has failed to demonstrate any merit to this claim and any prejudice from its default.

### 9. **Kittrell's Failure to Interview Payne**

Mosley asserts that Kittrell committed misconduct by failing to interview Payne between the shooting on December 2 and Payne's death on December 8. This claim is

completely without merit.  First, Mosley cannot offer any reliable evidence of what Payne would have said during an interview, so there is no way to know if any admissible exculpatory evidence would have come from such an interview.  More than likely, based on statements Payne made to the 911 operator, to Officer Pavia, and to Nurse Reynolds, nothing in an interview with Payne would have been particularly exculpatory to Mosley.  There is certainly no prejudice to Mosley from defaulting this claim.

### 10. Trial Court not Allowing Mosley to Argue his own Post-Trial Motion

Mosley filed a pro se motion to set aside the verdict after his attorney filed one.  Trial R. at 484–520.  At the arguments on the motions, the trial court noted that Mosley and counsel had filed similar motions, and he asked to hear from defense counsel[4] with respect to the motions.  Id. at 1358.  After hearing from defense counsel and the Commonwealth, the court denied the motion.  For the first time in his state habeas petition, Mosley alleged that the trial court denied his due process rights by failing to allow him to argue his own motion.  The habeas court denied the claim as procedurally defaulted.

Mosley cannot demonstrate prejudice from defaulting this claim because there is no error.  A criminal defendant has no statutory or constitutional right to proceed pro se while simultaneously being represented by counsel; a court is not required to permit "hybrid representation."  McKaskle v. Wiggins, 465 U.S. 168, 183 (1984); United States v. Carranza, 645 Fed. Appx. 297, 300 (4th Cir. 2016) (unpublished).  Mosley's new counsel argued the issues raised and referred the court to the written submissions as well.

---

[4] Mosley's trial counsel withdrew before argument on the motions, and new counsel was appointed.  His new attorney argued the issues raised in both motions.

11. **Trial Court Instructing the Jury on First-Degree Murder**

Mosley alleges that the trial court erred in allowing first-degree murder to be submitted to the jury and instructing them on that charge. The sole basis for his claim is that he was indicted for second-degree murder only. However, as explained in subsection A(2) above, the indictment charged common-law murder, in violation of Virginia Code § 18.2-32, in proper form, which supports a conviction for first-degree or second-degree murder. While it is understandable that Mosley thought he was charged with second-degree murder based on the letter from his attorney, dated June 21, 2015 (Pet. Exs. at 7, ECF No. 5-1), the law is that the indictment properly charged first-degree murder. Accordingly, the trial court committed no error in allowing that charge to go to the jury and instructing them on its elements. Also, as previously noted, the jury did not convict Mosley of first-degree murder. Because the claim is without merit, Mosley has not shown prejudice to overcome his default.

B. **Ineffective Assistance of Counsel Claims**

Claims for ineffective assistance of counsel are governed by standards in addition to those governing other federal habeas claims. To establish ineffective assistance of counsel, a petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment <u>and</u> (2) that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Petitioner must meet both prongs of the test.

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." <u>Id.</u> at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must

presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. Id. at 689–90. A reviewing court must presume that counsel rendered adequate decisions and that all significant decisions were made in the exercise of reasonable judgment. In the context of federal habeas review, the Strickland standard is "doubly deferential" because the deferential standard of review under Strickland overlaps with the deferential standard required by § 2254. Woods v. Etherton, 578 U.S. 113, 117 (2016); Cullen v. Pinholster, 563 U.S. 170, 190 (2011). In other words, federal courts on habeas review are to give the benefit of the doubt to both the state court and the defense attorney. Woods, 578 U.S. at 117. If the standard is difficult to meet, that is because it was meant to be. Harrington v. Richter, 562 U.S. 86, 103 (2011).

To establish prejudice under Strickland, Mosley must show that there is "a reasonable probability that the outcome of the proceedings would have been different" but for the deficient performance of counsel. Strickland, 466 U.S. at 694. That reasonable probability must be sufficient to undermine confidence in the outcome of the trial. Id.

## 1. **Failure to Object to First-Degree Murder**

Mosley alleges that counsel was ineffective for failing to object to prosecution arguments that Mosley was guilty of first-degree murder and for failing to object to first-degree murder instructions. In his state habeas petition, Mosley raised counsel's failure to object to the prosecutor's arguments for first-degree murder, but he did not challenge counsel's failure to object to the jury instructions. Thus, the ineffectiveness for failure to object to the jury instructions has not been presented to the state court. Exhaustion is satisfied only when the same factual allegations and legal theories offered in federal court have been properly

28

presented to the highest state court.  Picard v. Connor, 404 U.S. 270, 275–76 (1971).  Because

failure to object to the jury instructions was not raised in the circuit court habeas proceeding,

even if it were added to the petition for appeal, it would not be properly before the appellate

court.

For claims of ineffective assistance of counsel, there is a special test for overcoming

procedural default.  Martinez v. Ryan, 566 U.S. 1, 13–15 (2012).  A federal habeas court will

consider ineffective assistance of counsel claims if (1) the claim is a "substantial claim;" (2) the

"cause" is the lack of habeas counsel or ineffectiveness of habeas counsel under the standards

of Strickland; (3) the state post-conviction proceeding was the first time ineffective assistance

of counsel was raised; and (4) the state post-conviction proceeding was the first one in which

petitioner was actually or effectively allowed by state law to raise the claim.  Id.; Trevino v.

Thaler, 569 U.S. 413, 423 (2013).

Three prongs of the Martinez/Trevino test clearly apply here.  Mosley did not have

counsel when he filed his state court habeas petition.  His claims for ineffective assistance of

counsel were first raised during the habeas proceeding.  Finally, under Virginia law, ineffective

assistance of counsel claims must be raised in habeas proceedings, not on direct appeal.  Lenz

v. Commonwealth, 261 Va. 451, 460, 544 S.E.2d 299, 304 (2001).  The remaining question is

whether Mosley's defaulted claim is "substantial," meaning simply that the claim must have

some merit.  Martinez, 566 U.S. at 14.  Having some merit does not mean that the prisoner is

entitled to relief; it means only that there is enough merit for the federal court to consider the

claim even though it has been defaulted.  Id. at 17.

On the exhausted portion of this claim, counsel was not ineffective for failing to object to the prosecutor's arguments, as there was nothing to object to.  The indictment properly charged first-degree murder, just as the Commonwealth argued.  Noting that an indictment charging murder is sufficient to support a verdict and judgment for murder in the first-degree, the state habeas court reasonably denied this claim.  For the same reason, Mosley's claim that counsel should have objected to the jury being instructed on first-degree murder has no merit and is not substantial.  This portion of the claim was not exhausted in state court, and Mosley has failed to overcome his default.

## 2.  Failure to Call Witnesses

Mosely alleges that counsel was ineffective in failing to call witnesses to testify.  In his current petition, he identifies those witnesses as Mutts, Turner, Franklin, his [unnamed] physical therapist, and three of the first responders on the scene.  In his state habeas petition, however, he did not provide those names, nor did he provide any details in his state petition about what his witnesses would have said.  Properly applying federal law, the state habeas court held that Mosley failed to make a viable claim for ineffective assistance because Mosley failed to identify the witnesses not called, failed to say what their testimony would have been, and failed to obtain affidavits from the witnesses to indicate their willingness to testify in the manner stated.  This was a proper application of federal law, as explained in <u>Bassette v. Thompson</u>, 915 F.2d 932, 940–41 (4th Cir. 1990).

As discussed in the previous subsection, to the extent that Mosley has now provided new facts, including the names and anticipated testimony of purported witnesses, this court cannot consider those new facts that were not presented in the habeas petition to the circuit

court.  Picard, 404 U.S. at 275–76.  Those facts were not presented to the state habeas court in the form required by Virginia's procedural rules.  Supplying the information when appealing the decision of the habeas court is not timely.  Providing the information to the federal court that was not presented to the circuit court does not cure the default.

However, as previously discussed, Martinez can relieve a petitioner from the consequences of default if the conditions are met; Mosley categorically meets three of the conditions.  The remaining issue is whether this claim is substantial, or has some merit, now that the claim details have been fleshed out.  For the reasons next discussed, the court finds that this claim is without merit, and Mosley cannot overcome his procedural default.

First, determining what witnesses to call is one of the key strategic decisions consigned to defense counsel during a trial.  Gonzalez v. United States, 553 U.S. 242, 249 (2008).  As such, an attorney's tactical decision on which witnesses to call must be presumed within the range of reasonable competence unless evidence shows the decision to be so unreasonable that it constitutes ineffective assistance of counsel.  Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir. 1977).  The proffer Mosley provided for the testimony of Linwood Turner and Patricia Franklin would have minimal influence on the outcome of the trial.  Mosley asserts that Turner was another inmate in the same pod with Davis and himself, and that Turner would confirm that Davis had heard rumors about the shooting being over a girl before Mosley arrived in the pod.  While conceivably inconsistent with one aspect of Davis' testimony, it regards a collateral matter and does not otherwise bear on whether Mosley acted in self-defense.  Patricia Franklin, Turner's girlfriend who visited Turner regularly in jail, allegedly lived with the mother of the victim, Keith Payne, and was a source of information, through

Turner to Davis, explaining how Davis knew so many details about Mosley's case.  It is not known whether Franklin had any knowledge over and above the information in the copies of the arrest and search warrant affidavits, which Mosley testified were in his pod, that Davis already had seen.  Mosley did not explain what knowledge she had, and there is no way of knowing what she knew, whether she communicated the information to Turner, and whether he communicated it to Davis.  Mosley makes a lot of assumptions that he asks the court to accept as true, but without affidavits from the prospective witnesses, it is sheer speculation that the testimony of these two witnesses would provide information helpful to Mosley's defense.  Accordingly, for these witnesses, he has shown neither deficient performance nor prejudice.

Counsel did subpoena the first responders.  Pet. Exs. at 26–27.  Although he did not call them to the stand, the Commonwealth called Officer Ramirez, and counsel had the opportunity to cross-examine her and obtain the information about the photos of the crime scene as they appeared before Kittrell was on scene, and several other points.  Strategically, there is no reason counsel would need to call her again.  As for the first responders under subpoena who did not take the stand, Mosley has not identified what information they would provide that was not already provided by Officers Pavia, Ramirez, Caputo, Gardner, and Doss.  Failing to introduce cumulative evidence does not prejudice a defendant.  Hunt v. Nuth, 57 F.3d 1327, 1333 (4th Cir. 1995). Therefore, Mosley cannot establish prejudice, nor has he demonstrated deficient performance.

Mosley alleges that the physical therapist could have corroborated the nature of the shoulder problems he was having and that he would have been limited in his ability to raise

his arm behind himself to unlock the security lock when he tried to exit the apartment to get away from Payne before shooting in self-defense.  Significantly, Mosley does not name the physical therapist, and it is unknown whether he provided a name to his attorney.  Further, counsel did subpoena the medical records from the physical therapy office, along with the records custodian, for trial.  The records were introduced into evidence on his behalf as Exhibit F.  Trial R. at 1090.  The jury had those records to examine during their deliberation.  While testimony of the physical therapist may have been preferable, counsel got the information to the jury through the records, rendering the therapist's potential testimony cumulative.  Under Nuth, absence of cumulative evidence does not prejudice a petitioner within the meaning of Strickland.  57 F.3d at 1333.  Nor can the court say that counsel's decision to rely upon the medical records was outside the wide range of strategic decisions competent counsel could make.  Even if counsel's strategic choice, in hindsight, was not the "best possible representation at trial, Strickland only requires adequate counsel judged by a standard of reasonableness in light of the prevailing norms of practice."  Hunt, 57 F.3d at 1333.

The final witness, Mutts, would allegedly have testified that Payne showed the .38 caliber revolver to Mutts and told him it was his [Payne's].  Mosley has attached counsel's notes as an exhibit, and the notes dated September 16, 2015, include the following:  "** – Mutts was at apt. and KP showed it to Mutts and told him it was his. (Works for the city) – another guy was with them.  Brown skin, 200 lbs, . . . . Solomon Mutz, Warren Mutz."  Pet Exs. at 16–17.  These notes were not provided to the state habeas court and are not part of the state record for habeas review.  Although Martinez allows the court to consider this

ineffective assistance claim, the Supreme Court recently held that Martinez does not create an exception to § 2254(e)(2), which severely limits when a federal habeas court may consider evidence that was not developed in the state court record. Shinn v. Ramirez, 142 S. Ct. 1718, 1736 (2022). Section 2254(e)(2) prohibits the court from holding an evidentiary hearing on claims that were not developed properly in state court unless the claim relies on a new and previously unavailable rule of constitutional law made retroactive to cases on collateral review by the Supreme Court or is based on facts that could not previously have been discovered by due diligence. The right to call witnesses is certainly not a new rule of constitutional law, and Mosley obviously must have known since before his trial that he had provided Mutts' name to counsel. Based on Shinn and § 2254(e)(2), this court cannot hold an evidentiary hearing on this claim and cannot consider evidence that was not considered by the state habeas court.

Further complicating the matter is that counsel's letter responding to the state habeas, made part of the state court habeas record, asserts that "I do not know what witnesses Mr. Mosley requested that were not presented. . . . There are no witnesses that I can recall that would have given testimony beneficial to Mr. Mosley's defense." Habeas R. at 54. Counsel did not have the benefit of Mosley naming Mutts as a witness who was not called, nor would he now have the opportunity to explain why he believed Mutts was not a good witness to call, because Mosley is not entitled to an evidentiary hearing to develop his claim. The bottom line is that, based upon the state habeas record available for consideration, Mosley has not established deficient performance. Nor has he established prejudice, because ownership of the gun is irrelevant to possession of the gun. Mosley clearly had possession of the gun when he fired at Payne, not once but twice. Even if the jury believed that the gun was Payne's,

Payne reached for the gun first, and Mosley was able to grab it first, the jury could still have concluded that Mosley was not defending himself at the time he fired the shots.

Because Mosley has failed to demonstrate deficient performance or prejudice arising from failure to call these witnesses, he cannot overcome his default of this claim.

### 3.  Failure to Have Investigator Retrieve Bullet from Wall

Mosley alleges that counsel was ineffective for failing to have an investigator search for and retrieve a bullet from the crime scene, possibly lodged in the wall.  In the state habeas court, he alleged only that counsel was ineffective for failing to hire an investigator to retrieve "exculpatory evidence" from the crime scene.  However, in his letter responding to the state habeas, counsel's response to this claim included the following:

> I do recall some talk about a "third" shot and/or bullet that Mr. Mosley felt may be relevant because Roy Davis . . . stated that Mr. Mosley told him that he fired two times.  I do not believe that delving into whether he shot two or three times helped in his case, and if anything would support an intent to kill.

Habeas R. at 55.  Although the state habeas court dismissed the claim as conclusory, for failing to state what evidence counsel should have found and how it would have affected the outcome of the trial, the state court also held that counsel's decision not to pursue a third bullet was a reasonable tactical decision, because the existence of a third bullet would not have been helpful to the case.  The trial court's decision is a reasonable determination of fact and a reasonable application of federal law.  Accordingly, the court cannot grant relief on this claim.

### 4.  Failure to Subpoena Requested Phone Records

Mosley raised this issue in his state habeas claim, and the state habeas court rejected it.  Counsel responded that he had reviewed telephone logs subpoenaed by the Commonwealth,

which showed calls to Payne and Mosley from Breauna between 9:20 p.m. and 10:47 p.m. and that Payne's last phone call before he called 911 was to Tiffany Reed, his girlfriend.  Counsel concluded that the phone logs were not helpful to the defense.  The state habeas court held that this was a reasonable tactical decision, such that Mosley failed to establish deficient performance.  Because Mosley did not say how the phone logs could have been helpful to his case, he failed to show any prejudice.  The state court's determination of facts and application of law was reasonable, and this court cannot grant relief on this claim.

**5.  Failure to Obtain Victim's Criminal Record and Use it at Trial**

In the state habeas court, Mosley raised this issue as a Brady issue, arguing that the prosecution failed to provide Payne's criminal record.  The failure of counsel to obtain and use the record at trial was not raised.  Because ineffective assistance of counsel is a different legal theory than the one presented to the state court, the ineffective assistance of counsel claim is exhausted and defaulted.  Picard, 404 U.S. at 275–76.  Under Martinez, the court must determine whether this claim has merit to survive procedural default, as the other three criteria of Martinez have already been met, as previously discussed.

As alleged by Mosley, the claim is insufficient.  Mosley does not state what prior convictions Payne may have had; therefore, the court cannot determine whether counsel could have introduced them into evidence.  When a defendant claims self-defense, evidence of prior acts of violence by the victim is relevant to show defendant's reasonable apprehension of harm and to show the victim's tendency towards aggressive behavior.  Randolph v. Commonwealth, 190 Va. 256, 265, 56 S.E.2d 226, 230 (1949); Luck v. Commonwealth, 30 Va. App. 36, 43–44, 515 S.E.2d 325, 328 (1999).  The acts of violence must be "so connected in time, place and

circumstance with the homicide, as to likely characterize the deceased's conduct towards the defendant." Randolph, 190 Va. at 265, 56 S.E.2d at 230; Luck, 30 Va. App. at 44, 515 S.E.2d at 328. Otherwise, a decedent's prior criminal record is not relevant or admissible. Without knowing what prior convictions Payne had and whether the crimes involved violent conduct, there is no way to determine whether any of the convictions were admissible. Accordingly, Mosley has not established deficient performance, nor has he shown any prejudice from counsel's failure to put Payne's criminal record into evidence. Mosley has not overcome his procedural default of this claim.

**6. Failure to Introduce Evidence that Victim was in Motion, Not Lying on Couch**

Mosley's complete allegation is that counsel was ineffective in contradicting the evidence in the police summary report, but the focus of his claim in this petition was the Commonwealth's argument that the blanket proved that Payne was lying down when he was shot. This particular factual allegation was not raised in the state petition, and under Picard, it is exhausted and defaulted. 404 U.S. at 275–76. Mosley cannot overcome this procedural default because his argument is without merit.

First, the police summary report was not—and could not be—introduced into evidence, because it contained hearsay statements of other officers, among other reasons. C.f. Lawrence v. Commonwealth, 279 Va. 490, 498–99, 689 S.E.2d 748, 753 (2010) (holding that expert opinion based on hearsay in police report was not admissible). Nor did Detective Kittrell testify about the summary police report. He testified about taking samples from Mosley with the GSR kit and about talking with Mosley briefly in the interview room, enabling

him to recognize Mosley's voice on a recorded phone call from the jail.  Kittrell did not testify about his opinions or theories on the case, nor did he summarize the reports of other officers.

Officers from the scene, including Officers Pavia, Ramirez, and Doss, testified about what they observed at the scene and photos taken.  Photos taken by Ramirez showed Payne leaning onto the couch with his legs on the floor, and the blanket was bunched on the left side of the sofa.  The defense brought these facts out in cross-examination.  The defense also obtained Dr. Bowers opinion that Payne was in forward motion at the time of the shots, based on the trajectories of the bullets.  Either the jury discounted this evidence in favor of other evidence, or the jury found that Mosley did not act reasonably in self-defense even though Payne was in motion.  That is the jury's prerogative.

Because counsel presented the evidence, including that Payne was not lying down when shot, there was no deficient performance.  Without deficient performance, there is no ineffective assistance of counsel, and this claim has no merit.  Mosley has failed to overcome his procedural default of this claim.

## 7.  Failure to Introduce Letters from Davis During Ineffective Cross-Examination

In his state petition, Mosley alleged ineffective assistance of counsel for failing to introduce crucial documents and physical evidence and failing to cross-examine the state's "key witness" effectively.  In the current petition, he adds the important additional facts that the key witness is Roy Davis and that the documents are letters Davis wrote to the Commonwealth Attorney seeking favorable treatment on his charges in exchange for his testimony against Mosley.  Because those specific facts were not presented to the state court,

the claim is exhausted and defaulted.  <u>Picard</u>, 404 U.S. at 275–76.  Mosley cannot overcome the procedural default because his claim for ineffective assistance on this issue is without merit.

The state habeas court held that counsel was not deficient in cross-examining Davis, and that decision is a reasonable determination of facts and application of law.  Counsel amply drew attention to the irony of Davis claiming to be an honest man despite his six prior felony convictions, including several for larceny.  He thoroughly demonstrated that Davis had motive to fabricate testimony.  He even read passages from Davis' letter to Davis, asking him if he told the prosecutor he expected these benefits.  Davis' efforts to avoid answering the questions directly made him appear less than candid, and counsel's effort to impeach him was thorough.

Davis' letters were not offered into evidence by counsel.  The court need not address whether that constituted deficient performance because Mosley was not prejudiced by the failure.  Having questioned Davis about the letters on cross examination, the letters themselves would have been cumulative, and failure to introduce cumulative evidence is not prejudicial.  <u>Hunt</u>, 57 F.3d at 1333.  Mosley has failed to overcome his procedural default of this claim.

### 8.  <u>Failing to Inform the Jury of Evidence Withheld from Trial by Prosecutor</u>

Failing to inform the jury of evidence withheld from the trial by the prosecution is the first of several claims made under Claim 8.  More generally, Mosley alleged that counsel failed to subject the state's case to meaningful adversarial testing by: (1) Failing to tell the jury not only that the state did not analyze the drugs but that the behavior was somehow improper; (2) failing to introduce portions of the police summary report showing Reed's statements that Payne said he did not believe that Mosley meant to shoot him; (3) failing to ask Nurse Reynolds why she did not notify the police when Payne was conscious and able to be interviewed; (4)

failing to ask Kittrell why he did not interview Payne during the six days Payne remained alive; (5) failing to remind the jury that Dr. Bowers opined Payne was in motion when shot; and (6) failing to object to the prosecutor's numerous misstatements in closing argument. Mosley raised each of these objections in his state habeas case. For the reasons summarized below, the state habeas court's decision was a reasonable determination of the facts and a reasonable application of federal law, which means this court cannot grant relief on any of them.

The state habeas court found that counsel questioned Kittrell about the decision not to send the drugs to the lab for analysis. Accordingly, counsel was not deficient in his performance. Further, Mosley was not prejudiced. The jury heard testimony from several officers that the white powder was believed to be cocaine. Mosley has not demonstrated any additional benefit to his defense from having the drugs analyzed.

As mentioned previously, police report summaries are not admissible in evidence because they contain hearsay. Lawrence, 279 Va. at 498, 689 S.E.2d at 752. The statements that Mosley wanted counsel to introduce here were double hearsay: What Reed told the police officer and what Payne told Reed. Counsel's performance is not deficient for failing to offer inadmissible evidence. See United States v. Mason, 774 F.3d 824, 833 (4th Cir. 2014). Nor was Mosley prejudiced, because the statements were not exculpatory for Mosley, as the state habeas court reasonably determined.

The state court found no deficient performance in counsel's cross-examination of Nurse Reynolds, and no prejudice to Mosley from failing to ask her why she did not tell the police to come talk to Payne when he was awake. Nor was there any deficiency in failing to ask Kittrell why he never interviewed Payne. The state court's decision is reasonable because

Payne was in the hospital undergoing multiple surgeries and recovering from life-threatening injuries.  Further, there is no prejudice because there is no evidence to suggest that Payne would have told the police anything different than what he had already told the 911 dispatcher and Officer Pavia the night of the shooting.

The state habeas court found no deficient performance in counsel's presentation of Dr. Bowers' opinion to the jury.  Counsel elicited the opinion that Payne was in motion when he was shot.  He also obtained her acknowledgment that Payne had marijuana and cocaine in his system.  The state court noted that Mosley had not detailed any other information that counsel should have elicited from Dr. Bowers.  The court's factual findings and application of the law were reasonable.

Finally, the trial court noted that Mosley failed to identify specific arguments of the prosecutor that were misstatements.  Based on Mosley's expanded explanation of this sub-claim in the current petition, it appears that Mosley considers statements that contradict his own view of the evidence to be incorrect.  That is not the law.  The Commonwealth's Attorney was entitled to argue the facts testified to by witnesses who contradicted Mosley, and he was entitled to argue any reasonable inferences from the evidence, even if Mosley understandably preferred to focus on different testimony and different inferences.  As indicated previously, prosecutors enjoy wide latitude in closing arguments.  Bates, 308 F.3d at 422.  Even if the Commonwealth's Attorney misspoke on some points in closing (which Mosley has not identified), counsel is not deficient for failing to object during closing argument.  Choosing not to draw attention to adverse arguments and not to antagonize the jury by making too many

objections is a "virtually unchallengeable" strategic choice.  Sigmon v. Stirling, 956 F.3d 183, 195 (4th Cir. 2020) (citing Strickland).

Because the state habeas court reasonably determined the facts and reasonably applied federal law, this court cannot grant habeas relief on these claims.

**9.  Failing to Allow Mosley to Argue his Motion to Set Aside Verdict**

Mosley listed this claim as ineffective assistance of appellate counsel.  However, the motion to set aside the verdict was heard by the trial court and was not part of the appeal. New counsel had been appointed for Mosley, and the new counsel handled the post-trial motions, sentencing hearing, and the appeal.  At the time the motion was argued, he was acting as trial counsel.  This distinction is important, because Mosley did not raise this issue in his state habeas, and he cannot do so now, so the issue is simultaneously exhausted and defaulted. Defaulted issues regarding ineffective assistance of trial counsel can be overcome under the Martinez test, if all four prongs are met.  Mosley does not meet the meritorious claim prong.

Earlier in this opinion, the court noted that it does not have to consider motions filed by a party pro se who is already represented by counsel.  Moreover, Mosley has not shown any likelihood of a different outcome if he had argued the motion instead of his attorney. Accordingly, he cannot show prejudice, and this is not a substantial claim.  Mosley has failed to overcome his procedural default of this claim.

10. **Appellate Counsel's Failure to Argue Ineffectiveness and Other Issues**

Mosley raised appellate counsel's failure to raise ineffective assistance of trial counsel during the appeal in his state habeas petition, and the state court properly and reasonably held that counsel was not deficient in failing to argue ineffective assistance of counsel because ineffective assistance issues cannot be raised on direct appeal in Virginia.   Lenz v. Commonwealth, 261 Va. 451, 460, 544 S.E.2d 299, 304 (2001).   Counsel is not required to raise issues that are not cognizable in the appellate court.   Because ineffective assistance claims are not cognizable on appeal, the appellate court would have dismissed those claims, so there is no prejudice to Mosley from counsel's failure to raise that claim.

As for other issues that Mosley wanted raised in his appeal, Mosley has not identified what issues they were.   He alleges only that counsel did not get Mosley's input on the issues Mosley wanted to include.   Although the client makes the decision whether to appeal, choosing the issues to raise on appeal is the professional responsibility of the attorney, unless the defendant is representing himself and has no attorney.   A defendant cannot insist that counsel raise every colorable issue that he wishes.   Jones v. Barnes, 463 U.S. 745, 751–52 (1983). Because Mosley cannot dictate the issues counsel chose to raise, counsel was not deficient in failing to raise issues Mosley wanted raised.   Mosley is not entitled to relief on this claim.

## V.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.   Fed. R. Gov. § 2254 Cases 11(a).   A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2553(c)(2).   The movant must show that reasonable jurists could debate

whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).  In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right. Gonzalez v. Thaler, 565 U.S. 134, 140–41 (2012).  Mosley has not made such showings in this case.

For the foregoing reasons, the court will grant respondent's motion to dismiss, deny petitioner's motion for summary judgment, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

**ENTER:**  This 28th day of October, 2022.

Digitally signed by Michael
F. Urbanski      Chief U.S.
District Judge
Date: 2022.10.28 18:32:03
-04'00'

Michael F. Urbanski
Chief United States District Judge